**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| JOSHUA A. BAILEY, | CASE NO. 5:21-cv-02154 |
| Plaintiff, | DISTRICT JUDGE SARA LIOI |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

Plaintiff Joshua A. Bailey ("Plaintiff" or "Mr. Bailey") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying his applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge pursuant to Local Rule 72.2. For the reasons set forth below, the undersigned recommends that the Court **VACATE and REMAND** the Commissioner's decision.  On remand, the ALJ should at minimum explain how he considered the factors of supportability and consistency in assessing the persuasiveness of Dr. Sassano's medical opinion.

## I.  Procedural History

On March 15, 2018, Mr. Bailey filed applications for SSI and DIB, alleging a disability onset date of May 1, 2016.  (Tr. 13, 228-31, 232-37, 247.)  He asserted that he was disabled due to degenerative disc disease, spinal stenosis, anxiety, and depression.  (Tr. 117, 125, 251.)  His applications were denied at the initial level (Tr. 117-22) and upon reconsideration (Tr. 125-29).

He then requested a hearing.  (Tr. 130-31.)  On January 23, 2020, Mr. Bailey appeared for a hearing before an Administrative Law Judge.  (Tr. 56-64.)  The hearing was continued to allow Mr. Bailey an opportunity to obtain counsel.  (Tr. 60-61.)  On January 12, 2021, a second hearing commenced with Mr. Bailey represented by counsel.  (Tr. 30-55.)

On January 22, 2021, the ALJ issued an unfavorable decision, finding Mr. Bailey had not been under a disability from May 1, 2016 through the date of the decision.  (Tr. 10-29.)  Mr. Bailey requested review of the decision by the Appeals Council. (Tr. 225-27.)  On September 22, 2021, the Appeals Council denied Mr. Bailey's request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6.)

## II. Evidence

Because Mr. Bailey's challenges on appeal relate to the ALJ's consideration of certain VE testimony and the medical opinion of his treating provider John Sassano, D.O., the summary below is focused on the evidence relevant to those two arguments.

### A.    Personal, Educational, and Vocational Evidence

Mr. Bailey was born in 1995.  (Tr. 21.)  He has his GED.  (Tr. 34.)  His most recent employment was working in a customer call center for a cable company.  (Tr. 36-37.)

### B.    Medical Evidence

#### 1.    Treatment History

On March 9, 2016, Mr. Bailey presented to Barberton Family Practice ("Barberton") to establish care.  (Tr. 566.)  He saw Vu Tran, MD.  (*Id.*)  He reported having back pain for several months.  (*Id.*)  He had recently received treatment at the emergency room for his back pain on two occasions.  (*Id.*)  He reported there was no imaging done at the emergency room, and that he had been discharged with Flexeril and Naprosyn. (*Id.*)  He reported his pain was in the lower

2

lumbar and sacral regions, and he described it as dull, achy, and non-radiating.  (*Id*.)  He also

reported that he had been evaluated by his prior primary care physician, and that a lumbar x-ray

showed mild arthritis.  (*Id*.)  He was attending physical therapy, with several sessions remaining.

(*Id*.)  Physical therapy helped minimally.  (*Id*.)  He explained that he worked at a pizza place and

was constantly lifting heavy items, and "if he work[ed] 3 consecutive days, he would notice[] his

back pain . . . worsened."  (*Id*.)   Examination findings included normal musculoskeletal range of

motion, no edema, spasm, normal strength and reflexes, normal gait and coordination, no sensory

deficit, and negative straight leg raise test with full range of motion of the back without

difficulty.  (Tr. 567.)  Dr. Tran also noted abnormal examination findings, including pain in the

lumbar back with tenderness along the vertebral spine and lumbar region.  (*Id*.)  Mr. Bailey was

diagnosed with chronic back pain, possibly due to arthritis and obesity.  (*Id*.)  Dr. Tran noted that

Mr. Bailey's back pain looked benign on examination.  (*Id*.)  He advised Mr. Bailey to continue

physical therapy and recommended NSAIDs as needed for pain, muscle relaxer as needed for

spasm, a lumbar back brace when working, and warm compresses.  (*Id*.)  Dr. Tran also

encouraged weight loss and explained to Mr. Bailey that his weight could be contributing to his

back pain.  (*Id*.)

On April 21, 2016, Mr. Bailey returned to Barberton for follow up regarding his back

pain.  (Tr. 580.)  He saw Taslima Shaikh, M.D.  (*Id*.)  He reported that his new job making

dough at a pizza place was putting strain on his back.  (*Id*.)  He reported that physical therapy

made "a little bit of a difference."  (*Id*.)  He reported that he had tried dry needling, which helped

a lot.  (*Id*.)  He also reported mild relief with NSAIDs, heat, and the use of a back brace while at

work.  (*Id*.)  He stated that he felt the pain mostly after working long hours.  (*Id*.)   He reported

stiffness in the morning and symptoms of numbness and paresthesias.  (Tr. 580-81.)  His

examination findings were similar to those from his March visit with Dr. Tran.  (*Compare* Tr. 581 *with* Tr. 567.)  He was assessed with chronic back pain for more than three months and a lumbar spine MRI was ordered.  (Tr. 581.)  He was also advised to continue taking NSAIDs and muscle relaxants.  (*Id*.)

After obtaining his MRI, Mr. Bailey returned to Dr. Tran on May 10, 2016.  (Tr. 587.)  He reported no improvement in his back pain, occasional numbness in his lower extremities.  (*Id*.)  He was noted to be overweight.  (Tr. 588.)  Examination of the lumbar back showed decreased range of motion due to pain, tenderness, bony tenderness and pain.  (*Id*.)  There was no spasm and he had normal strength and reflexes, no sensory deficit, negative Romberg sign, and negative straight leg raise test.  (*Id*.)  The May 2016 MRI showed degenerative and facet changes that were most prominent at L4-L5.  (Tr. 409.)  Mr. Bailey was diagnosed with protrusion of lumbar intervertebral disc L4-L5.  (Tr. 588.)  He was referred to Neurosurgery and Spine, counseled on weight loss and lifestyle changes, and advised to practice good back stretches and work-related activities.  (*Id*.)

On April 14, 2017, Mr. Bailey returned to Barberton where he saw Jason Frampton, M.D.  (Tr. 381.)  He reported neck pain with radiation over the top of the head that had been ongoing for two to three months.  (*Id*.)  He reported that "exacerbations typically occur[red] following cracking of his neck."  (*Id*.)  He reported left eye twitching with no vision changes.  (*Id*.)  He also reported a history of migraines but denied having a headache associated with his reported pain.  (*Id*.)  His cervical back examination findings included normal range of motion, no swelling, no edema, no pain, and no spasm, but also tenderness of the spinous processes and bony tenderness.  (Tr. 382.)  His physical examination also revealed a negative Spurling's test but with subjective pain on the left side of the face.  (*Id*.)  He exhibited normal strength and muscle tone, with no

cranial nerve or sensory deficits.  (*Id*.)  He was diagnosed with left-sided neck pain.  (*Id*.)  Dr. Frampton recommended neck stretching / strengthening exercises.  (*Id*.)

On November 2, 2017, Mr. Bailey presented to Barberton for a pain management visit with Akarsh Parekh, M.D.  (Tr. 409.)  He reported chronic back pain for three years.  (*Id*.)  Dr. Parekh reviewed the MRI from May 2016, noting it showed degenerative disc and facet changes most prominent at L4-L5.  (*Id*.)  Mr. Bailey reported that he was previously referred to a neurosurgeon but had not followed up on it.  (Tr. 409-10.)  He also reported that he had been to physical therapy for seven months but it had not helped.  (Tr. 410.)  Ibuprofen also had not helped.  (*Id*.)  He reported that his pain was worse with exertion, sitting for extended periods of time, and with flexion of his back.  (*Id*.)  He also reported having headaches for about six months that had worsened over the prior two days.  (*Id*.)  He explained that his headaches started in the back of his head and radiated to the front, with about one episode of pain for an hour each day. (*Id*.)  There was no aura, nausea, or vomiting associated with his headaches.  (*Id*.)  His examination revealed mild tenderness at the lateral borders of the bilateral eyebrows.  (Tr. 412.) His motor strength and sensation were normal in all four extremities. (*Id*.)   He was diagnosed with chronic midline low back pain without sciatica and persistent headaches, described as "likely tension headaches."  (*Id*.)  He was prescribed Mobic and referred to physical therapy and the pain clinic.  (*Id*.)

On November 14, 2017, Mr. Bailey returned to Barberton.  (Tr. 416, 418.)  He saw Stephanie Delvecchio, M.D.  (*Id*.)  He reported that he only took the previously prescribed Mobic for three days because it caused severe mood swings that left him feeling "extremely irritated" and caused him to have to leave work.  (*Id*.)  He stated he was scheduled for a new patient appointment in February at the pain clinic.  (*Id*.)  He expressed interest in trying a

medication other than Mobic, noting that he had tried ibuprofen and naproxen without relief. (*Id.*)  On examination, he ambulated without issue, and demonstrated normal musculoskeletal range of motion, normal neck range of motion, no midline tenderness or bony step-offs, no pain with neck flexion, and no visible deformities.  (Tr. 419.)  He did have right-sided paraspinal tenderness to palpation.  (*Id.*)  He was started on Lodine in place of Mobic for treatment of his back pain and headaches.  (Tr. 418.)

On December 6, 2017, Mr. Bailey returned to Barberton.  (Tr. 424.)  He saw Michael Sellechio, M.D.  (*Id.*)  He reported that his back pain had been stable, occurred only with heavy lifting, and was worse in the morning.  (*Id.*)  Examination findings were generally unremarkable, including full neck, back, and musculoskeletal range of motion, no edema, no tenderness to palpation in the spine, and normal strength bilaterally.  (Tr. 426.)  He was continued on Lodine for his back pain and headaches, and was advised to continue with stretching exercises and physical therapy.  (*Id.*)

On January 26, 2018, Mr. Bailey returned to see Dr. Parekh, stating he wanted a letter indicating he could not work due to his chronic low back pain.  (Tr. 449.)  He reported that his call center job involved sitting for long periods, and stated that his low back pain was worse with standing, walking, and prolonged sitting, although he also stated that sitting alleviated his pain. (*Id.*)  He reported that he was scheduled to see neurosurgery and pain management the following month.  (*Id.*)  Examination findings were normal, including normal range of motion in the low back and normal strength and sensation in all four extremities.  (Tr. 451.)  Straight leg raise test was negative on the left but positive on the right.  (*Id.*)   Dr. Parekh indicated he could not provide Mr. Bailey with a letter stating he needed to be off work, but he provided a letter indicating that due to degenerative disc disease he was limited to working six hours a day.  (*Id.*)

On January 31, 2018, Mr. Bailey returned to Barberton.  (Tr. 455.)  He saw Dr. Rehman Tariq, M.D.  (*Id*.)  He reported that Lodine, Mobic, and Motrin did not help his pain.  (*Id*.)  His pain was alleviated by stretching and lying down. (*Id*.)  He reported that he was working six hour shifts and only received one 15-minute break after working for almost four hours.  (*Id*.)  He stated he wanted another break during his six-hour shift because prolonged sitting hurt his back and he wanted the ability to get up and stretch.  (*Id*.)  He reported that his employer denied his request for the extra break.  (*Id*.)  Mr. Bailey's physical examination findings included tenderness to palpation over the lumbar spine and pain with flexion/extension.  (Tr. 456.)  Straight leg raise testing was negative bilaterally.  (*Id*.)

On February 26, 2018, Mr. Bailey presented to Summa Health for a pain management visit with Aisha Rahman, M.D.  (Tr. 532-33.)  He described his pain as dull/aching, cramping, squeezing, and tightness, with it being a 10/10 at its worst and a 2/10 at its best.  (Tr. 533.)  He reported that his pain was aggravated by standing, walking, climbing stairs, and bending forward or backward.  (*Id*.)  He reported associated symptoms of numbness, tingling, leg weakness, and balance problems.  (*Id*.)  He stated that he tried physical therapy, home exercises, a brace, and medications without relief.  (*Id*.)  He also reported having undergone a surgical evaluation, but said it was determined he was not a surgical candidate.  (*Id*.)

A March 2, 2018 x-ray of his lumbar spine showed minimal degenerative facet changes in the lower lumbar spine.  (Tr. 525.)  On March 21, 2018, Dr. Rahman administered an L4-L5 interlaminar epidural steroid injection.  (Tr. 537.)

On April 16, 2018, Mr. Bailey returned to Barberton for a pneumonia vaccine and for completion of disability paperwork.  (Tr. 475, 477.)  He saw Jenna Hartman, M.D.  (Tr. 475.)  He reported difficulty standing for long periods of time and mild difficulty concentrating.  (*Id*.)

Examination findings were unremarkable. (Tr. 477.) Dr. Hartman prescribed Voltaren for his chronic low back pain. (*Id*.)

On April 23, 2018, Mr. Bailey underwent a psychological consultative exam with Sudhir Dueby, Psy.D. (Tr. 484-92.) He reported that he was applying for disability "on his own recommendation" because of asthma, chronic back pain, spinal stenosis, depression, anxiety, and ADHD. (Tr. 484.) He said he usually relied on others for transportation, but was otherwise able to perform his daily activities without assistance. (Tr. 486.)

On May 2, 2018, Dr. Rahman administered a second L4-L5 interlaminar epidural steroid injection. (Tr. 545.) On June 7, 2018, Mr. Bailey returned to Dr. Rahman, reporting no significant pain relief following the two epidural steroid injections. (Tr. 861-62.) Examination findings were unremarkable. (Tr. 864.) Prior back examination findings were noted, including normal examination findings of no tenderness to palpation of the sacroiliac joints, no significant tenderness to palpation over the iliac crests, greater trochanters, or piriformis muscle, normal lumbar spine range of motion with flexion, extension, rotation, and side bending, normal strength, negative straight leg raise testing, and a non-antalgic gait. (Tr. 864.) There were also abnormal examination findings, including hypertonicity and tenderness to palpation in the thoracic and lumbar paraspinal musculature, and pain and tenderness in the paraspinal muscles with facet loading by rotation on extension of the lumbar spine to the right or left. (*Id*.) Dr. Rahman diagnosed chronic midline low back pain without sciatica, degenerative lumbar disc disease, and lumbar facet arthropathy. (Tr. 865.) Dr. Rahman recommended that they not complete the remainder of the epidural injections because they did not help. (*Id*.) Instead, he recommended lumbar L3-5 medial branch blocks and possibly L3-5 radiofrequency ablation. (*Id*.) Dr. Rahman also prescribed Topamax. (*Id*.)

On July 17, 2018, Mr. Bailey returned to Summa Health for follow up regarding his chronic low back pain. (Tr. 869.) He saw Mary Lesko, APRN-CNP. (*Id*.) He reported he was tolerating Topamax and was "anxious to get his medial branch blocks scheduled." (Tr. 870.) He reported he wanted to get back to work, noting he had been off work for five months. (*Id*.) Examination findings were similar to those from his June visit with Dr. Rahman. (*Compare* Tr. 872 *with* Tr. 864-65.) On July 25, 2018, Dr. Rahman administered the medial branch blocks at L3-5. (Tr. 557.)

On August 8, 2018, Mr. Bailey returned to CNP Lesko. (Tr. 877.) He reported no pain relief from the medial branch block. (*Id*.) He also reported that he continued to have low back pain with occasional tingling in his feet. (*Id*.) He felt that his pain was worse, and indicated that lying down no longer helped relieve his pain – it now made it worse. (*Id*.) He stated he wanted to have another MRI. (*Id*.) He reported that Topamax was helping, but that he continued to have headaches. (*Id*.) He also reported that he was back to work as a call center representative. (*Id*.) Examination findings were similar to those from his June and July visits. (*Compare* Tr. 880-81 *with* Tr. 864-65, 872.) CNP Lesko also noted that Mr. Bailey's musculoskeletal examination showed that he was able to move all extremities, fine motor was intact, and he could sit and rise from the examination table easily. (Tr. 880.) In addition to diagnoses of chronic midline low back pain without sciatica, degenerative lumbar disc disease, and lumbar facet arthropathy, Mr. Bailey was diagnosed with chronic headaches. (Tr. 881.) His Topamax dosage was increased. (*Id*.) A repeat MRI was ordered because of his reported worsening symptoms. (Tr. 881.) A decision was made not to proceed with radiofrequency ablation because he did not have relief from the medial branch blocks. (*Id*.)

On September 11, 2018, Mr. Bailey returned to CNP Lesko for follow up regarding his back pain, radicular symptoms, and headaches. (Tr. 886.) He reported that Topamax was helping his headaches "tremendously," but it was not "decreasing the tingling, just making it more tolerable." (*Id.*) He reported that his insurance denied coverage for the lumbar spine MRI. (*Id.*) He stated that his back and radicular problems were worse if he walked more than a half mile. (*Id.*) He stated he usually wanted to sit down after ten minutes, and had to sit down after twenty minutes. (*Id.*) Examination findings were similar to his August visit. (*Compare* Tr. 888-89 *with* Tr. 880-81.) Mr. Bailey's Topamax was continued because it was helping with his headaches. (Tr. 889.) He was not certain it was helping with his radicular symptoms. (*Id.*) He called his insurance company during the visit to appeal the denial of the lumbar MRI. (*Id.*)

On March 7, 2019, Mr. Bailey returned to CNP Lesko, reporting that his back pain had been more bothersome over the prior six months. (Tr. 893.) His headaches had been worse since he ran out of Topamax. (*Id.*) He requested a referral to physical therapy. (Tr. 892-93.) He reported that he was unemployed, and he was unable to complete his activities of daily living due to pain. (*Id.*) His examination findings were similar to prior findings. (*Compare* Tr. 896 *with* Tr. 888-89.) He was referred to physical therapy and another request for the lumbar spine MRI was made. (Tr. 897.)

On April 2, 2019, Mr. Bailey had an MRI of his lumbar spine. (Tr. 1032-34.) The impression was: small central disc extrusion at L5-S1, minimally increased since prior study; mild disc bulges at L3-L4 and L4-L5 causing mild bilateral foraminal narrowing and abutting the exiting L3 and L4 nerve roots, respectively; and mild degenerative changes of the lumbar spine. (Tr. 1034.)

On April 24, 2019, Mr. Bailey returned to CNP Lesko to review the MRI results.  (Tr. 902.)  CNP Lesko noted that Mr. Bailey had tried various treatment modalities with limited positive relief.  (*Id*.)  Lumbar epidural steroid injections and medial branch blocks had been tried without relief.  (*Id*.)  Mr. Bailey tried NSAIDs for at least one month without relief.  (*Id*.)  A muscle relaxant had helped but only the upper back muscles.  (*Id*.)  Topamax helped his occipital nerve / headaches.  (*Id*.)  He had tried physical therapy in the past but could not complete because of transportation issues.  (*Id*.)  He was diagnosed with lumbar radiculopathy, lumbar disc bulge, lumbar facet arthropathy, and chronic pain.  (Tr. 902.)  He was started on gabapentin and referred to physical therapy.  (Tr. 902-03.)

On June 11, 2019, Mr. Bailey returned to CNP Lesko for follow up regarding his chronic back pain, radicular symptoms, and headaches.  (Tr. 907.)  He reported he was moving around more while using a Virtual Reality headset and it helped with his problems.  (Tr. 907, 910.)  He reported that he stopped taking gabapentin because it caused diarrhea.  (Tr. 907.)  He stated he had not yet attended physical therapy because he kept forgetting about it.  (Tr. 907, 910.)  His physical examination findings were normal, except that he had difficultly sitting and rising from an elevated chair.  (Tr. 909.)  He was diagnosed with lumbar radicular pain, lumbar degenerative disc disease, lumbar facet arthropathy, and chronic headache.  (Tr. 910.)  CNP Lesko encouraged Mr. Bailey to attend physical therapy and continued his Topamax.  (*Id*.)

On August 2, 2019, Mr. Bailey attended a physical therapy evaluation at Tallmadge Physical Therapy & SportsCare.  (Tr. 759-66.)   Physical examination findings included normal strength, some reduced trunk range of motion, and some pain with repeated motion testing localized to the middle back.  (Tr. 766.)  Physical therapy was recommended to increase trunk range of motion, increase sitting tolerance, decrease pain, and enable Mr. Bailey to perform

activities of daily living without lumbar and lower extremity pain.  (Tr. 765.)  Mr. Bailey

attended physical therapy throughout August, September, and October, reporting constant but

less intense pain and demonstrating increased range of motion.  (Tr. 747-58.)

On September 6, 2019, Mr. Bailey returned to Dr. Rahman for a follow up regarding his

chronic pain.  (Tr. 914-19.)  He denied any changes in his pain.  (Tr. 915.)  He reported he had

started physical therapy and requested that another medication to be added to Topamax for his

headaches.  (*Id*.)  No musculoskeletal exam was performed.  (Tr. 918.)  He was diagnosed with

chronic midline low back pain without sciatica, lumbar degenerative disc disease, and lumbar

facet arthropathy.  (Tr. 919.)  Dr. Rahman continued Topamax and added Relafen.  (*Id*.)

On November 22, 2019, Mr. Bailey presented to John Sassano, D.O. at the Cleveland

Clinic as a new patient for a physical examination.  (Tr. 1044.)  He denied any major complaints.

(*Id*.)  Apart from noted dental and vision issues, Mr. Bailey's physical examination findings were

normal.  (Tr. 1045-46.)  Dr. Sassano recommended regular exercise.  (Tr. 1046.)

On December 17, 2019, Mr. Bailey returned to Dr. Rahman.  (Tr. 922.)  He reported that

physical therapy was working well for his lower back, but it was not helping his upper back.  (Tr.

923.)  He reported that his neck and upper back pain were getting worse. (Tr. 923.)  He reported

that Topamax was working well, but Relafen was not working at all.  (*Id*.)  On examination, Mr.

Bailey had normal range of motion in the neck and bilateral shoulders and no tenderness to

palpation. (Tr. 926.)  He was diagnosed with chronic midline low back pain without sciatica,

lumbar degenerative disc disease, lumbar facet arthropathy, and cervicalgia.  (Tr. 927.)  Dr.

Rahman ordered a cervical spine x-ray, continued Topamax, and added Celebrex.  (*Id*.)

On January 13, 2020, Mr. Bailey had the cervical spine x-ray.  (Tr. 958-59.)  The x-ray showed minimal degenerative changes at C2-C3 with no evidence of acute bone injury or malalignment.  (Tr. 959.)

On January 17, 2020, Mr. Bailey returned to Dr. Rahman.  (Tr. 931.)  He reported that his insurance company would not approve Celexa until he tried Mobic. (Tr. 932.)  He reported that he was continuing to attend physical therapy, stating that it helped his back pain but not his neck pain.  (*Id*.)  Examination findings were normal.  (Tr. 935.)  Mr. Bailey's diagnoses were unchanged.  (*Compare* Tr. 936 *with* Tr. 927.)  Dr. Rahman prescribed Mobic and scheduled Mr. Bailey for cervical trigger point injections.  (Tr. 936.)  On January 27, 2020, Dr. Rahman administered Mr. Bailey's cervical trigger point injections.  (Tr. 940-41.)

On February 11, 2020, Mr. Bailey returned to Dr. Sassano regarding his chronic headaches, asthma, and anxiety.  (Tr. 1055.)  He reported that his headaches caused pain in the bilateral, temporal, and parietal region that radiated to his face.  (*Id*.)  He rated his pain as moderate and reported that his headaches were associated with bright light, activity, and loud noise.  (*Id*.)  He reported associated symptoms of malaise/fatigue and nausea.  (*Id*.)  He reported that medication provided moderate relief for his headaches.  (*Id*.)  Physical examination findings were unremarkable.  (Tr. 1057.)  Mr. Bailey was diagnosed with chronic tension-type headaches, not intractable, stable on medication.  (*Id*.)  He was also diagnosed with mild intermittent asthma and anxiety.  (*Id*.)

On March 23, 2020, Mr. Bailey returned to Dr. Rahman for follow up.  (Tr. 944.)  He reported that the cervical trigger point injection provided him with only one day of relief.  (*Id*.)  He could not get his prescription for Mobic filled due to insurance reasons.  (Tr. 944-45.)  He wanted disability paperwork filled out and stated he felt "his disability request looks better if he

is on more medications for pain." (Tr. 945.) Examination findings were normal. (Tr. 948.) Dr. Rahman continued to prescribe Topamax and added Relafen again, since Mobic was not covered by insurance. (Tr. 949.) Dr. Rahman explained he only prescribed medication if it was necessary, not to make disability paperwork look better. (*Id*.) He recommended adding a steroid to the anesthetic for the cervical trigger point injection, since the injection had only lasted one or two days. (*Id*.) Mr. Bailey was also advised to continue with stretching at home. (*Id*.)

On May 14, 2020, Mr. Bailey dropped off a disability form at Dr. Sassano's office. (Tr. 1062.) The next day, Dr. Sassano made the following note: "Why am I filling out disability form? What is the reason? I have only seen this patient for complete physical and anxiety x1." (*Id*.) On May 18, 2020, Mr. Bailey scheduled an appointment with Dr. Sassano to fill out the forms. (Tr. 1063.)

On June 23, 2020, Mr. Bailey attended an office visit with Dr. Sassano. (Tr. 1068.) He continued to complain of moderate pain associated with headaches that he described as throbbing. (*Id*.) He also complained of asthma. (*Id*.) Physical examination findings from the visit included: presence of carotid bruit in the neck; musculoskeletal tenderness; and decreased range of motion, tenderness, pain, and spasms in the cervical and lumbar back. (Tr. 1069-70.) Mr. Bailey was diagnosed with anxiety and mild intermittent asthma. (Tr. 1070.)

Mr. Bailey also returned to Dr. Rahman on that same day. (Tr. 776.) He reported that he continued to have neck pain and reported that the pain was "pretty bad." (Tr. 777.) He was interested in trying trigger point injections again and hoped that they lasted longer. (*Id*.) Physical examination findings were generally normal, including normal neck range of motion, no tenderness to palpation, and normal range of motion in the bilateral shoulders. (Tr. 780.) The treatment notes also include a recitation of prior back examination findings, with abnormal

findings that included hypertonicity, tenderness to palpation, and pain with facet loading.  (*Id*.)
Mr. Bailey's diagnoses of chronic midline low back pain without sciatica, lumbar degenerative
disc disease, lumbar facet arthropathy, and cervicalgia were unchanged.  (Tr. 781.)  Dr. Rahman
continued the prescription for Topamax.  (*Id*.)

On October 4, 2020, Mr. Bailey called Dr. Sassano's office complaining of the "worst
headache" of his life.  (Tr. 1075.)  He complained of excruciating pain that prevented him from
performing any normal activities.  (Tr. 1075-76.)  He was instructed by Dr. Sassano's office to
go to the emergency room for his symptoms.  (*Id*.)  There does not appear to be record of a visit
to the emergency room following that call to Dr. Sassano's office.

On October 19, 2020, Mr. Bailey had a telephone health visit with Dr. Sassano.  (Tr.
1078-79.)  He reported that he continued to have headaches and felt that the pain center was
"blowing him off."  (Tr. 1078.)  He stated his headaches occurred daily and caused pain through
the back of his neck, dizziness, weakness, and nausea.  (*Id*.)  He reported no other joint pain or
muscle aches.  (*Id*.)  No examination was performed since the visit was not in person.  (*Id*.)  Mr.
Bailey was diagnosed with chronic tension-type headache, not intractable and Dr. Sassano
referred him to a neurologist.  (Tr. 1078-79.)  Mr. Bailey had a brain MRI on November 23,
2020, which was normal. (Tr. 1039-40.)

### 2.      Opinion Evidence

#### a.      Treating Source

On June 23, 2020, Dr. Sassano completed a Physical Medical Source Statement.  (Tr.
772-75.)  Dr. Sassano noted that the "frequency and length of contact" was seven years.  (Tr.
772.)  As clarified at the hearing, Mr. Bailey became a patient of Dr. Sassaso's in November

2019 but had known him for longer because Mr. Bailey's grandmother had been a patient of Dr. Sassano's for many years.  (Tr. 48-49.)

Dr. Sassano indicated that Mr. Bailey had a diagnosis of degenerative lumbar disc disease and his prognosis was fair.  (*Id*.)  Dr. Sassano listed the following symptoms: pain, stiffness, leg weakness, and intermittent numbness in the feet.  (*Id*.)  He stated that Mr. Bailey had severe aches in the lower lumbar spine and neck daily.  (*Id*.)  Clinical findings and objective findings included spasms, tenderness, and decreased range of motion in the lumbar and cervical spine. (*Id*.)  Dr. Sassano indicated that treatment modalities included Topamax, NSAIDs, and pain management for injections.  (*Id*.)

Dr. Sassano opined that Mr. Bailey could sit for twenty minutes at one time, stand for ten minutes at one time, sit for a total of two hours in an eight-hour period, and stand/walk for a total of two hours in an eight-hour period.  (Tr. 773.)  He opined that Mr. Bailey would need to walk every forty-five minutes for four or five minutes at a time, and would need to take unscheduled breaks every one to two hours for fifteen-minute periods due to chronic fatigue, pain/ paresthesias, and numbness.  (*Id*.)  Dr. Sassano opined that Mr. Bailey could occasionally lift and carry ten pounds, rarely lift and carry twenty pounds, and never lift and carry fifty pounds.  (Tr. 774.)  He opined that Mr. Bailey could use his hands and fingers for grasping, turning, and twisting objects and fine manipulations ninety percent of the time during an eight-hour period. (*Id*.)  He also opined that Mr. Bailey could reach in front and overhead with his arms 25% of the time during an eight-hour workday.  (*Id*.)

Dr. Sassano opined that Mr. Bailey would be off task 25% or more of the time, and would be incapable of even "low stress" work due to a history of being able to perform low stress jobs.  (Tr. 774-75.)  He also opined that Mr. Bailey's impairments would cause good and

bad days, but he would likely be absent from work more than four days per month due to his impairments.  (Tr. 775.)

### b.    State Agency Reviewing Medical Consultants

On initial review, on June 4, 2018, state agency medical consultant Mehr Siddiqui, M.D. opined that Mr. Bailey had the physical RFC to:

- lift and/or carry twenty pounds occasionally and ten pounds frequently;

- stand and/or walk about six hours in an eight-hour day;

- sit about six hours in an eight-hour day;

- never climb ladders, ropes, or scaffolds;

- occasionally climb ramps or stairs, stoop, kneel, crouch, and crawl; and

- frequently balance.

(Tr. 71-73, 82-84.)

At the reconsideration level, on January 12, 2019, state agency medical consultant William Bolz, M.D. affirmed the initial RFC findings.  (Tr. 97-98, 110-11.)

### C.    Hearing Testimony

### 1.    Plaintiff's Testimony

At the January 12, 2021, hearing, Mr. Bailey testified in response to questioning by the ALJ and his counsel.  (Tr. 34-49.)   Mr. Bailey was living with his grandmother.  (Tr. 34-35.)  He reported that he was not the primary caretaker for his grandmother, as she had aides to help her at home.  (Tr. 35.)  He did help with some things around the house, like simple meal prep and laundry.  (Tr. 35, 43.)  Mr. Bailey reported he could drive and had recently taken a trip, driving about four hours out of state.  (Tr. 35-36.)

Mr. Bailey testified that he left his job at the cable company because of problems with his back. (Tr. 37.)   His back pain was mostly in his low back, closer to his tailbone, and he also had pain in his upper back.  (Tr. 39, 46.)  He stated his back pain was constant and worse with physical activity.  (*Id*.)  He rated his pain as a four out of ten without activity and an eight out of ten with activity.  (Tr. 39.)  He reported no surgical intervention for his back problems.  (*Id*.)  He testified that he had tried multiple medications, not including controlled substances.  (Tr. 37-38.)  He stated that none of the medications seemed to work.  (Tr. 38.)  He reported taking ibuprofen or Tylenol if things got really bad.  (*Id*.)  He also reported he had tried to lose weight and he did a lot of stretches to try to relieve his back pain.  (Tr. 40.)

Mr. Bailey described constant pressure headaches located in the back of his head, closer to his neck.  (Tr. 40.)  He reported trying Topamax without good relief, and then starting on Amitriptyline, which helped but made him sleepy.  (*Id*.)  Loud noise and exposure to sunlight after being indoors made his headaches worse.  (Tr. 40-41.)  He indicated that indoor lighting was generally not an issue as long as it was not florescent lighting.  (Tr. 41.)

Mr. Bailey testified that he had injections in his back in 2018, but they provided no relief. (Tr. 46.)  While he reported that he did benefit from an injection in his neck, he did not follow up to get another injection.  (*Id*.)

Mr. Bailey stated that he could walk for about an hour and a half, and could stand for about twenty minutes.  (Tr. 41.)  He estimated being able to walk about a mile or half a mile without pain setting in or needing to rest.  (*Id*.)  If he had to manage more than one flight of stairs, he said he would have pain.  (*Id*.)  He estimated being able to lift fifteen pounds without having pain.  (Tr. 42.)  He also said he could reach in front of him with his arms and hands, but would be bothered if he had to hold his arms out for extended periods.  (*Id*.)  Bending at his waist

for more than a brief period caused lower back pain.  (*Id*.)  He could bend at his knees, but not for extended periods.  (Tr. 42-43.)

### 2.  Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  (Tr. 49-54.)  The VE classified Mr. Bailey's past work as follows: customer service representative, sedentary, skilled; fast food worker job, light, unskilled; and stocker, heavy, semi-skilled.  (Tr. 49-50.)

The ALJ asked the VE to assume a hypothetical individual the same age and with same education and past work experience as Mr. Bailey who could:

> lift 10 pounds frequently, 20 pounds occasionally, carry 10 pounds frequently, 20 pounds occasionally, push 10 pounds frequently, 20 pounds occasionally, pull 10 pounds frequently, 20 pounds occasionally, could sit, stand and walk six out of an eight hour work day . . . work should be unskilled, SVP 1 to 2 which by definition are jobs learned in 30 days or less requiring little judgment.  The work should not involve any arbitration, mediation or negotiation.  The work should not involve any full time care of welfare of another, for example, nursing home type work.  The work should be low stress which I'll further define as low quota.  The social interaction with the public, co-workers and supervisors should be occasional and he should be permitted to have a sit, stand option as follows, only as needed.  During the sit, stand option he could continue to work.  In terms of frequency, no more than four times and in terms of duration, no more than three minutes at a time and the purpose of the sit, stand option is just to stand and shift position to alleviate any stress.

(Tr. 50-51.)  The VE identified the following light, unskilled jobs in the national economy as consistent with the hypothetical: officer helper, price marker, and garment sorter.  (Tr. 51.)  Mr. Bailey's counsel then proceeded to pose questions to the VE relating to the limitation to occasional interaction with supervisors, which resulted in the VE explaining: "If you're saying someone is unable to interact with a supervisor during two-thirds of a day which is frequent and that is what's required, then I would say I have no jobs."  (Tr. 53-54.)

Mr. Bailey's counsel then asked the VE to assume that the hypothetical individual as described by the ALJ would be absent three days per month.  (Tr. 54.)  In response, the VE

testified that there would be no jobs available.  (*Id.*)  The VE also testified that there would be no

jobs available if the individual was off task 20% of the time.  (*Id.*)

### III. Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments

depends on the existence of a disability.  Disability is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable to
> do his previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which exists in the
> national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to

follow a five-step sequential analysis set out in agency regulations.  The five steps can be

summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must
    be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a
    severe impairment that has lasted or is expected to last for a continuous
    period of at least twelve months, and his impairment meets or equals a listed
    impairment, the claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must
    assess the claimant's residual functional capacity and use it to determine if
    the claimant's impairment prevents him from doing past relevant work.  If
    the claimant's impairment does not prevent him from doing his past relevant

work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[1] *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy. *Id.*

### IV. The ALJ's Decision

In his January 22, 2021 decision, the ALJ made the following findings:[2]

1.      The claimant meets the insured status requirements through March 31, 2021. (Tr. 16.)

2.      The claimant has not engaged in substantial gainful activity since May 1, 2016, the alleged onset date. (*Id.*)

3.      The claimant has the following severe impairments: degenerative disc disease, osteoarthritis, tension headaches, and spinal stenosis. He has the following non-severe impairments: asthma, obesity, depression, and post-traumatic stress. (Tr. 16-17.)

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments. (Tr. 17-.)

5.      The claimant has the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) except he would need to alternate between sitting and standing,

---

[1] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

[2] The ALJ's findings are summarized.

four times per day, lasting three minutes at a time; he could work in both the sitting and standing position; he is capable of unskilled work, defined as occupations with specific vocational preparation codes 1 or 2; he can perform no tasks requiring arbitration, mediation, or negotiation or be responsible for the full-time care or welfare of others; he is capable of low stress jobs with no production quotas; and he can have occasional interaction with the public, peers, and supervisors.  (Tr. 18-21.)

6.  The claimant has no past relevant work. (Tr. 21.)

7.  The claimant was born in 1995 and was 20 years old, defined as a younger individual age 18-49, on the alleged disability onset date.  (*Id*.)

8.  The claimant has at least a high school education.  (*Id*.)

9.  Transferability of job skills is not material.  (*Id*.)

10. Considering the claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  (Tr. 21-23.)

Based on the foregoing, the ALJ determined that Mr. Bailey had not been under a disability from May 1, 2016 through the date of the decision.  (Tr. 23.)

### V. Plaintiff's Arguments

Mr. Bailey's first assignment of error is that the VE provided contradictory testimony regarding the effect of social interaction limitations on the availability of jobs, and that the ALJ therefore erred by relying on that testimony without first resolving the alleged contradictions. (ECF Doc. 11 pp. 1, 12-15, ECF Doc. 14.)  Mr. Bailey's second assignment of error is that the ALJ did not properly evaluate the opinion of his treating physician Dr. Sassano.  (ECF Doc. 11 pp. 1, 15-21.)

### VI. Law & Analysis

#### A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record. *See Blakley v. Comm'r Of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)); *see also Blakley*, 581 F.3d at 406. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

"'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if a preponderance of evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Blakley*, 581 F.3d at 406 ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there

is substantial evidence in the record that would have supported an opposite conclusion.'") (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007), citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004)).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.**      **First Assignment of Error: Whether ALJ Erred in Relying on VE Testimony**

In his first assignment of error, Mr. Bailey challenges the ALJ's reliance on the VE testimony to support his Step Five determination.  (ECF Doc. 11 pp. 1, 12-15, ECF Doc. 14.)  He argues that the VE provided contradictory testimony regarding the effect that social interaction limitations would have on the availability of jobs, and that the ALJ therefore erred by relying on that testimony to support his Step Five determination without first resolving the alleged contradictions.  (ECF Doc. 11 pp. 1, 12-15, ECF Doc. 14.)  The Commissioner responds that the ALJ properly relied on the VE's testimony because the testimony was not contradictory, and instead provided responses to two different hypothetical questions.  (ECF Doc. 13 pp. 21-23.)

"In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments."

*Parks v. Social Sec. Admin.*, 413 Fed. App'x 856, 865 (6th Cir. 2011).  "Hypothetical questions, however, need only incorporate those limitations which the ALJ has accepted as credible." *Parks*, 413 F. App'x at 865 (citing *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010) and *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).

Mr. Bailey does not contend that the VE hypothetical was inconsistent with the ALJ's RFC findings.  Nor does he specifically argue that the RFC limitation to occasional interaction with supervisors lacks the support of substantial evidence.  Rather, he contends that the VE provided contradictory testimony relating to the occasional interaction with supervisors limitation.  More particularly, he asserts the testimony was contradictory because:

> when the ALJ presented this limitation in his hypothetical as an individual only able to interact with supervisors occasionally (i.e., one-third of the workday), the VE identified three jobs, but when the inverse limitation was presented by Plaintiff's hearing level representative (an individual unable to interact with supervisors frequently (i.e., two-thirds of the workday)) the VE testified that no jobs would be available.

(ECF Doc. 14 pp. 1-2.)

At the hearing, the following exchange occurred between Mr. Bailey's counsel and the VE regarding the social interaction limitation included in the ALJ's hypothetical question:

> Q      Did you understand that the ALJ asked you to assume that the individual could interact with supervisors only occasionally?
>
> A      Yes, I did.
>
> Q      When you answered that question did you assume that the ALJ used the definition of occasional from the DOT?
>
> A      Yes, sir.
>
> Q      Does a worker decide when they'll accept criticism or instruction from a supervisor or does a supervisor decide that?
>
> A      That would be supervisor driven.

> Q    So if a worker is unable to interact with supervisors at a given moment during the work day, say up to two-thirds of the work day but the supervisor needs to instruct that worker, what's going to happen?
>
> A    I don't really understand what you mean, Counsel.  We were at occasional which is one-third of the day and now all of a sudden now you're at two-thirds of the day which is frequent.  I don't really understand what your question is doing now.  You need to be more specific.
>
> Q    Sure, say for example our worker is unable to interact with a supervisor up to two-thirds of the work day but that supervisor needs to interact with the worker.  What would happen?
>
> A    Well, first of all, that was not the hypothetical given by the Judge. If you're saying someone is unable to interact with a supervisor during two-thirds of a day which is frequent and that is what's required, then I would say I have no jobs.

(Tr. 53-54.)

SSA guidance states that VE testimony "generally should be consistent with the occupational information supplied by the DOT."  SSR 00-4p, *Use of Vocational Expert & Vocational Specialist Evidence, & Other Reliable Occupational Info. in Disability Decisions*, 2000 WL 1898704, *2 (Dec. 4, 2000).  Here, Mr. Bailey does not contend that the VE's testimony was not consistent with the DOT.  Indeed, the VE confirmed that she was using the definition of occasional as set forth in the DOT.  (Tr. 53.)  Rather, Mr. Bailey argues that:

> [A]n individual who is "unable to interact with supervisors for two-thirds of the workday" equates to one who is only "able to interact with supervisors for one-third of the workday"; it is simply presenting the inverse of the limitation. The VE thus offered contradictory testimony as to whether jobs would be available in response to exactly the same limitation.

(ECF Doc. 11 pp. 13-14 (emphasis removed).)  The undersigned finds this argument to be without merit.  An examination of the relevant testimony clearly reflects that the VE was responding to two distinct questions.

The questioning of the VE by Mr. Bailey's counsel, like Mr. Bailey's argument on appeal, relies on an assumption that "occasional interaction" is a time-specific limitation that only permits interaction during fixed periods that add up to one-third of the workday.  He also assumes that it would be in the employee's power to determine when those fixed periods of interaction would take place.  (*See* Tr. 53 ("[I]f a worker is unable to interact with supervisors at a given moment during the work day, say up to two-thirds of the work day but the supervisor needs to instruct that worker, what's going to happen?").)

The ALJ's RFC limitation to "occasional interaction with the public, peers, and supervisors" (Tr. 18) did not purport to limit Mr. Bailey in this manner.  The DOT defines occasional to mean the "activity or condition exists up to 1/3 of the time."  *See Dictionary of Occupational Titles*, Appx. C (4th Edition, Revised 1991), 1991 WL 688702 (Jan. 1, 2016); *see also Beasley v. Berryhill*, No. 5:16-CV-00108-LLK, 2017 WL 2543814, at *2 (W.D. Ky. June 12, 2017) (explaining "'[o]ccasional' means occurring from very little up to 1/3 of the time") (citing Social Security Ruling (SSR) 83-10, 1983 WL 31251).  Thus, a limitation to occasional interaction is a restriction on the total time the employee may spend interacting throughout the workday as a whole, without any specific limitation as to when that interaction would take place.  As another court in this District has explained:

> The limitation to "occasional interaction with ... supervisors" is a durational limitation. That is, it means the individual cannot interact with supervisors, for more than one-third of a total workday. It does not include that the individual be able to dictate during what portion of the workday that interaction occurs.

*Partin v. Comm'r of Soc. Sec.*, No. 3:18 CV 1573, 2019 WL 3755270 (N.D. Ohio July 22, 2019), *report and recommendation adopted*, 2019 WL 3753622 (N.D. Ohio Aug. 8, 2019); *see also Crawford v. Comm'r of Soc. Sec.*, No. 2:21-CV-726, 2021 WL 5917130, at *4 (S.D. Ohio Dec.

14, 2021) (quoting *Partin*), *report and recommendation adopted*, No. 2:21-CV-726, 2022 WL 219864 (S.D. Ohio Jan. 25, 2022)

For the reasons set forth above, the undersigned finds Mr. Bailey's argument that the VE's testimony was internally inconsistent is not supported by the record.  Accordingly, the undersigned finds the ALJ did not err in relying on the VE's testimony to support his Step Five finding.  Mr. Bailey's first assignment of error is without merit.

**C.     Second Assignment of Error:  Whether ALJ Erred in Finding Medical Opinion of John Sassano, D.O. Not Persuasive**

In his second assignment of error, Mr. Bailey argues it was unreasonable for the ALJ to find Dr. Sassano's opinion not persuasive.  (ECF Doc. 11 pp. 1, 15-21.)   The Commissioner responds that it was reasonable for the ALJ to find Dr. Sassano's opinions not persuasive because the opinions were not consistent with the record.  (ECF Doc. 13 pp. 18-20.)

The Social Security Administration's ("SSA") regulations for evaluation of medical opinion evidence in claims filed after March 27, 2017 apply in this case.  *See* 20 C.F.R. § 404.1520c.  Those regulations provide that "administrative law judges will now evaluate the 'persuasiveness' of medical opinions by utilizing the five factors listed in paragraphs (c)(1) through (c)(5) of the regulation."  *Jones v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020) (quoting *Gower v. Saul*, 2020 WL 1151069, at * 4 (W.D. Ky, March 9, 2020) (citing 20 C.F.R. § 404.1520c(a) and (b)).  The five factors are supportability, consistency, relationship with the claimant, specialization, and other factors, with supportability and consistency acknowledged to be the most important factors for consideration. 20 C.F.R. § 404.1520c(c)(1)-(5); 20 C.F.R. § 404.1520c(b)(2).  While ALJs are required to explain how consistency and supportability were considered, they "may, but are not required to, explain how [they] considered the factors in paragraphs(c)(3) through (c)(5) of this section, as

appropriate, when [they] articulate how [they] consider medical opinions and prior

administrative medical findings in [a claimant's] case record." 20 C.F.R. § 404.1520c(b)(2).

Because the ALJ was expected to explain how he considered the most important factors –

supportability and consistency – in assessing the persuasiveness of Dr. Sassano's opinion, 20

C.F.R. § 404.1520c(b)(2), the undersigned will focus on those factors here.  The "supportability"

factor provides that an opinion is more persuasive "[t]he more relevant the objective medical

evidence and supporting explanations presented by a medical source are to support his or her

medical opinion." 20 C.F.R. § 404.1520c(c)(1) (emphasis added). The "consistency" factor

provides that a medical opinion is more persuasive when it is "more consistent … with the

evidence from other medical sources and nonmedical sources."  20 C.F.R. § 404.1520c(c)(2)

(emphasis added).  Thus, supportability is established by considering a medical source's own

objective evidence and explanations in support of his opinion, while consistency is established

by comparing that medical source's opinion findings with evidence from other sources.

Here, the ALJ considered Dr. Sassano's opinion and found it not persuasive, setting forth

his analysis as follows:

> Dr. John Sassano, DO completed a medical source statement on behalf of the
> claimant in June 2020 and stated that he can sit for 20 minutes at a time, stand for
> 10 minutes at a time, stand/walk/sit for about 2 hours in an 8-hour workday. He
> would require a sit/stand option every 45 minutes.  He would need unscheduled
> breaks every 1-2 hours. He can rarely lift up to 20 lbs. and occasionally lift up to
> 10 lbs. He can reach 25% of the time in any direction. The claimant would be
> incapable of even low stress work and would be off-task 25% of the workday. He
> would be absent four or more days a month on a consistent basis (Exhibit 6F). I do
> not find the opinion persuasive, as the limitations were not consistent with the
> claimant's relatively mild mental health limitations or normal to mild physical
> examinations.

(Tr. 20 (emphasis added).)   While the ALJ uses the word "consistent," it is not clear whether he

is referring to exam findings from Dr. Sassano (supportability) or other sources (consistency).

As a threshold matter, the ALJ's failure to use the word "supportability" in his findings is not automatic grounds for remand.  An ALJ "need not necessarily use the words 'supportability' or 'consistency,' as long as the ALJ still performs the requisite analysis of these factors," and a reviewing court is able to follow the ALJ's reasoning.  *Todd A. v. Kijakazi*, No. 3:20CV594 (DJN), 2021 WL 5348668, at *4-5 (E.D. Va. Nov. 16, 2021); *see also Anteer v. Kijakazi*, No. 3:20-CV-00952, 2021 WL 4424475, at *16 (N.D. Ohio Sept. 27, 2021) (finding indication that opinion lacked objective evidentiary support related to supportability and consistency, even though ALJ did not use the terms supportability or consistency).  Nevertheless, the ALJ's analysis must "build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877; *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005) (explaining that an ALJ's analysis "should be specific enough to permit the court to trace the path of the ALJ's reasoning") (citations omitted).

The undersigned therefore turns to the question whether the ALJ has sufficiently explained how he considered (1) the supportability of Dr. Sassano's opinion in light of Dr. Sassano's own "objective medical evidence and supporting explanations" and (2) the consistency of Dr. Sassano's opinion with evidence from other sources.  *See* 20 C.F.R. § 404.1520c(c)(1); 20 C.F.R. § 404.1520c(c)(2).  As noted above, when the ALJ said Dr. Sassano's "limitations were not consistent with the claimant's relatively mild mental health limitations or normal to mild physical examinations," he did not explain whether he was referring to Dr. Sassano's own physical examination findings and/or the physical examination findings of other sources.

A review of the ALJ's earlier discussion of the medical records does not provide further clarity.  For example, the ALJ described physical examination findings from a June 2020 evaluation as follows:

normal range of motion of the neck on flexion, extension, and rotation. There was no tenderness to palpation. The bilateral shoulders also had normal range of motion. <u>The thoracic and lumbar paraspinal musculature revealed hypertonicity and tenderness to palpation.</u> There was no tenderness to palpation of the sacroiliac joints and there was no significant tenderness to palpation over the iliac crests, greater trochanters, or piriformis muscles. His gait was non-antalgic. Manual muscle testing revealed strength graded 5/5 with bilateral hip flexion, knee extension, ankle dorsiflexion, and extensor hallicus longus. Straight leg raises, bilaterally in the seated position, did not reproduce radiated pain symptoms in the ipsilateral or contralateral lower extremity.

(Tr. 19 (emphasis added).)  While the ALJ provided no record citation to support these findings, a review of the record suggests he was referencing a June 23, 2020 pain management visit with Dr. Rahman.  (Tr. 780.)  Although not discussed by the ALJ, the record also reflects that Mr. Bailey had an office visit with Dr. Sassano on the same day.  (Tr. 1070.)  Dr. Sassano's physical examination findings included: musculoskeletal tenderness; decreased cervical range of motion, tenderness, pain, and spasm; and decreased lumbar back range of motion, tenderness, pain, and spasm.  (Tr. 1070.)  Other examination findings in the record include: a positive straight leg test on the right (Tr. 451); decreased range of motion in the lumbar back and tenderness (Tr. 588); and tenderness to palpation over the lumbar spine (Tr. 456).

In order for the Court to find that the ALJ had met his obligation to articulate findings as to both supportability and consistency, the undersigned would have to conclude that the ALJ's vague reference to "normal to mild physical examinations" was intended to specifically refer to the examination findings of <u>both</u> Dr. Sassano and other providers.  And because both Dr. Sassano and other providers did record some abnormal examination findings, the undersigned would additionally have to conclude that those abnormal findings were appropriately characterized as "normal to mild."  For example, the undersigned would have to conclude that the ALJ had found Dr. Sassano's findings of tenderness, pain, spasm, and decreased range of motion to be "normal to mild," even though the ALJ did not acknowledge or discuss those

findings in his decision.  The undersigned would have to reach similar conclusions as to other providers' findings of hypertonicity, tenderness, decreased range of motion, and positive straight leg test, only some of which were discussed in the opinion.  The chain of characterizations and assumptions this Court would have to make in order to find that the ALJ adequately articulated his basis for finding Dr. Sassano's opinion not persuasive is simply too attenuated.  The ALJ's minimally articulated findings leave the Court unable to meaningfully assess whether he adequately complied with regulations that required him to consider and explain both consistency and supportability when assessing the persuasiveness of Dr. Sassano's medical opinion.

The Commissioner contends that the ALJ's decision is supported by substantial evidence for other reasons, including that the opinion was a checkbox medical source statement, that Dr. Sassano questioned why he was completing a disability form for a patient he had only seen for a physical examination and anxiety, and that Mr. Bailey's treatment was conservative.  (ECF Doc. 13 pp. 18-20.)  But these additional reasons were not articulated by the ALJ as a basis for finding Dr. Sassano's opinion inconsistent or unsupported.  The undersigned accordingly finds that "the ALJ's failure to explain his decision deprived this court of a "logical bridge between the evidence on the record and his conclusion," *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011), and left the Commissioner, . . . to defend the ALJ's decision with impermissible, post-hoc rationalizations."  *Davidson v. Comm'r of Soc. Sec.*, No. 3:16CV2794, 2018 WL 1453472, at *2 (N.D. Ohio Mar. 23, 2018) (citing *S.E.C. v. Chenery*, 332 U.S. 194, 196 (1947)).

 "Although the new standards are less stringent in their requirements for the treatment of medical opinions, they still require that the ALJ provide a coherent explanation of his reasoning."  *White v. Comm'r of Soc. Sec.*, No. 1:20-CV-00588-JDG, 2021 WL 858662, at *21 (N.D. Ohio Mar. 8, 2021).  As explained herein, the undersigned finds that the ALJ's analysis of

the medical opinion evidence does not allow the Court to conduct a meaningful review of the decision.  Accordingly, the undersigned finds that remand for further evaluation of the medical opinion evidence is warranted.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the Commissioner be **VACATED and REMANDED** for further proceedings.  On remand, the ALJ should at minimum explain how he considered the factors of supportability and consistency in assessing the persuasiveness of Dr. Sassano's medical opinion.

October 24, 2022

*/s/ Amanda M. Knapp*
AMANDA M. KNAPP
UNITED STATES MAGISTRATE JUDGE

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).